Filed 6/27/13  P. v. Johnson CA1/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>STEPHON D. JOHNSON et al.,<br><br>        Defendants and Appellants. | A128751<br><br>(Alameda County<br>Super. Ct. No. C159518A & B) |

Co-defendants Stephon Johnson and Hezekiah Edwards were convicted of two murders with special circumstances (Pen. Code, §§ 187, 190.2, subd. (a)(3), (a)(10), (a)(15) & (a)(17)(B)),[1] one in Antioch and the second in Oakland, as well as one attempted murder at the time of the Antioch murder (§§ 187, 664).  They were both sentenced to life in prison without possibility of parole. Both appeal.

Edwards's appeal claims there was insufficient evidence of asportation to support a kidnapping special circumstance in connection with the Antioch murder and insufficient evidence to support the murder conviction itself.  He also claims he was convicted on all counts based solely on the testimony of an accomplice.

Johnson joins in those arguments and specifically claims there was insufficient evidence to support his conviction of the Oakland murder.  Johnson also argues he was unfairly convicted because the judge questioned a witness about aspects of the

---

[1] Undesignated statutory references are to the Penal Code.

identification testimony, which he claims made the judge an ally of the prosecutor and resulted in a fundamentally unfair trial.

In addition to the opening brief filed by his attorney, Johnson, with the court's permission, filed a handwritten supplemental opening brief further arguing the point about the judge's questioning of a witness, and also arguing that he was denied his right of allocution at sentencing.

We conclude that: the evidence was sufficient to support all convictions and findings; the convictions did not rest solely on accomplice testimony; and, with respect to the judge's questioning of the witness, the issue was forfeited by failure to object and in any case is unmeritorious. We further conclude that Johnson was not denied his right of allocution. We thus affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

This was a case built largely on circumstantial evidence. For that reason we recite the facts and evidence in detail.

### The Antioch murder and attempted murder

On March 24, 2006, Willie Lavall, Jr. was killed outside an apartment complex in Antioch where defendant Edwards's mother lived. At the time of the killing Lavall was accompanied by Johnny Denton, who was also shot but survived.

At approximately 4:30 p.m., Lavall and Denton, whose girlfriend lived in the apartment complex, were in the parking lot putting new license plates on Denton's car when a light green van pulled into the lot. Two African American men with guns got out of the van. One man pointed his gun at Lavall, and the other pointed his at Denton's face. The men told Denton and Lavall to get into the van, which was stopped some five to ten feet away. The assailants pushed Lavall and Denton toward the van. As they neared the van, Denton could see a third person in the driver's seat but could only say it was an African American; he could not tell if it was a man or a woman, nor could he judge height, body build, or facial features. There were no seats in the van behind the front seat.

2

Lavall took off running and was gunned down by one of the two assailants. He fell in front of the van. A nearby resident and the apartment manager heard three gunshots and called 911.

Denton also ran and disappeared around a dumpster, then heard Lavall screaming, and started to go back.He then realized he had been shot in the arm and sat down, fearing loss of blood.

Police recovered two casings at the crime scene. A slug was also pulled out of Lavall's chest. Later ballistics testing would show that both casings recovered were fired from one nine-millimeter gun.

Based on Lavall's condition, location, and drag marks in the area, it was determined that the van ran over him after he was on the ground and dragged him into the street, where he was found by a neighbor. One leg was folded under him in a contorted manner which made it appear he had only one leg; his shoes had been dragged off his feet.[2] There was road rash on his stomach, chest, face, and arms. Lavall told police he had been shot while trying to run away from a vehicle.

Lavall's bullet wound was not fatal, as the bullet lodged just under the skin of his chest. He was taken to the hospital, where he suffered cardiac arrest and died. His cause of death was determined to be blunt force trauma due to the dragging.

Neither Lavall nor Denton had any idea who their assailants were. Denton described the man who held the gun on him as being five feet eight inches tall, approximately 160 pounds, wearing a black hoodie and a knit cap known as a beanie, having dreadlocks or little twisties sticking out from under the beanie, with a little moustache. He told a police officer that his assailant had gold teeth on both the top and bottom. The apartment manager, who also saw the two gunmen in the parking lot from a

---

[2] Two baggies of cocaine, some packaged for sale, fell out of Lavall's pocket. Denton admitted at trial that Lavall was a crack cocaine dealer and that he (Denton) sold marijuana at that time. The prosecutor suggested their drug dealing may have provided a motive for the kidnapping attempt, but admitted he did not know exactly what the men in the van intended to do to the victims if the kidnapping had been successful.

distance of 180 feet, described both as being younger, slender African Americans, five feet ten to six feet tall, one with a lighter complexion than the other. He was unable to identify either of the gunmen from photo lineups.

According to Denton, the man who accosted Lavall was more heavy-set, but the apartment manager thought they were both of a similar slighter build. Denton described the second gunman as being a Black male adult, 23 years old, five feet ten inches tall, 250 pounds, with dreadlocks or twisties sticking out from underneath his hat.

Despite the similarity in Denton's description of the second gunman's build,[3] the prosecutor's theory was that Johnson and a second man wielded the guns while Edwards drove the van, evidently because Edwards did not match the description given by the apartment manager. The second gunman was never identified. There was no significant description of the driver other than that he or she was an African American whose complexion had a "little color."

Two months after the murder, Denton was shown four six-photo arrays and picked Johnson alone out of those lineups, expressing 80 percent certainty Johnson was the man who held the gun on him.[4] He was equally sure at the preliminary examination. Denton based his identification on Johnson's facial features, particularly his eyes and moustache. He was somewhat hesitant to identify Johnson as the gunman during the photo lineup because Johnson had short hair and did not have dreadlocks or twisties in the photo. The officer told him to imagine the man in the photograph with a different hairstyle, and Denton then picked Johnson. At trial four years after the crimes, Denton identified Johnson to a 60 percent or 70 percent level of certainty.[5]

---

[3] Edwards was five feet eleven inches tall, 250 pounds and 22 years old at the time of the offense.

[4] Edwards was also in one of the lineups, but the only person Denton identified was Johnson. Additional photo lineups were shown to Denton as the investigation progressed, but he did not identify any additional suspects.

[5] Unbeknownst to the jury, someone shot at Denton the night before he testified at trial but he was not injured.

Johnson, an African American, was five feet eight inches tall, 150 pounds, and 24 years old at the time of his arrest. He did not have dreadlocks or twisties in his hair, and it was stipulated that his hairstyle in March 2006 was the same short style as that pictured in the photo lineup. However, the lead investigator on the Oakland murder case testified it is common for criminals to disguise their appearance and it is easy to change the appearance of one's hair. Although Johnson lived in Oakland, Johnson's cell phone records show he was in Antioch at the time of the shooting, as was Edwards, and it may be inferred they traveled there together from Oakland.[6]

The initial police broadcast described the van as silver or cream-colored, occupied by three Black men. Shortly after intercepting that broadcast on his police scanner, a pizza delivery driver on Forty-Niner Way in Antioch saw three black men in their late teens or early twenties standing in a driveway across the street from a light green van. The van was parked headed in the wrong direction on the street. One Black man, described as five feet eight inches tall, with short hair, and 160-165 pounds, then ran across the street and jumped into the van and took off. After the van pulled out it made an abrupt U-turn.

The delivery driver wrote down the license plate. When a later police broadcast described the van used in the murder as light green, he called the police and gave them the license number. He was unable to identify either defendant as the man he saw jump into the van, but he said Johnson's build, complexion, and hairstyle were similar to those of the man he saw.

---

[6] Edwards's cell phone was in Oakland at 2:02 p.m. on March 24, in Lafayette at 2:17 p.m., in Antioch from at least 3:47 p.m. to 6:20 p.m., back in Oakland at 7:39 p.m., in Pittsburg at 10:29 p.m., in Antioch at 10:44 p.m., again in Oakland at11:50 p.m. to 1:01 a.m. on March 25, but in Pittsburg at 8:09 a.m. on the 25th.

Johnson's cell phone was in Oakland at 2:08 p.m. on March 24, near the Caldecott tunnel at 2:11 p.m., in Lafayette at 2:16 p.m., in Pittsburg at 3:14, and in Antioch at 4:37 p.m. (approximately seven minutes after the Lavall shooting). Johnson appears to have stayed in Antioch until at least 6:37 p.m., he was in Concord at 7:05 p.m., in Walnut Creek at 7:08 p.m., and back in Oakland at 7:45 p.m.

***The van***

The van proved to be the murder weapon. The license number matched one that had been rented from the Fox Rent-a-Car agency (Fox) at the Oakland airport. The police searched the van at Fox on March 27. They discovered blood, tissue, and fiber on the undercarriage. Testing of the blood showed it was Lavall's. The van had back seats, but they were removable. The police impounded the van.

According to Fox's records, the van had been rented in the name of Aberial (April) Bradley, but there was evidence that Edwards had been involved. The rental agent, Katrina Fritz,[7] had met both co-defendants previously through her boyfriend, David Bell.[8] Fritz sometimes rented vehicles to Edwards at a good rate because he was a friend of Bell's. Fritz also knew Edwards's girlfriend, Manika "Meka" Dunn.

Testifying as part of a plea agreement,[9] Dunn recounted her involvement with Bradley and Edwards in renting and returning the van used in the Lavall murder.

---

[7] Fritz testified at trial under a grant of use immunity. Defendants agree she was not an accomplice to either murder.

[8] The cell phone records further show that Bell, a close friend of both defendants , was called by Johnson at 4:37 p.m. on March 24, just minutes after the Lavall murder. Bell then traveled from Oakland to the Pittsburg/Antioch area.The prosecutor believed Bell was "completely intertwined" with the Antioch crimes but was not the second gunman because his cell phone was in Oakland at the time. The prosecutor theorized that Edwards and Johnson "hunkered down" in Antioch until about 7:00 p.m. when they both returned to Oakland. His theory seemed to be that Johnson rode back to Oakland with Bell, while Edwards drove his Oldsmobile Aurora.

[9] As we shall discuss, Bradley was murdered on March 28, 2006. Dunn originally was charged as a principal in that murder with special circumstances, as well as being an accessory after the fact to Lavall's murder. Dunn testified at trial under a negotiated plea bargain in which she pled guilty to one count of voluntary manslaughter in exchange for a prison sentence of not more than six years. She agreed to testify truthfully with the understanding that, after she served her sentence, she would be paroled to a location far from Oakland. Based on the time Dunn had already spent in custody, it was possible she would be released immediately after Edwards's and Johnson's trial.

Dunn's credibility was also challenged based on her past criminal conduct. Dunn had prior convictions for forgery and conspiracy to commit fraud, and had been charged with failure to return a rental car. She admitted that for eight years she had been stealing

Edwards and Dunn could not rent a car in their own names because neither had a valid driver's license or credit card. Bradley agreed to sign for the rental car because she was a friend of Edwards's mother and was a second mother figure to Edwards. Fritz did not know Bradley outside of the rental transaction, but Dunn and Bradley had become friends through Dunn's dating relationship with Edwards.

On February 14, 2006, Bradley had come to Fox rental agency with Edwards and Dunn and rented a Toyota Sienna van in her name. Although Bradley drove the van out of the rental lot, Edwards took over driving immediately afterwards. That van was traded in for a Mazda van on March 7, which in turn was returned and another Toyota Sienna (the murder van) was rented by Bradley on March 15. On that date Bradley and Dunn alone conducted the transaction with Fritz; Edwards was not there. Edwards and Dunn, however, shared use of the van through the rental period. Fritz confirmed that she had seen Edwards driving one of the rented Siennas with Dunn as a passenger. Around this same time, Edwards bought an Oldsmobile Aurora.

One evening in March 2006 (inferably the night of Lavall's murder), Edwards called Dunn while she was staying at a house on Brookdale Avenue in Oakland with Yushica Skipper, whom she referred to as her sister (though they were not biologically related). Dunn had an apartment in Antioch which she shared with Edwards, but she often stayed at Skipper's house because it was closer to where she worked.

During the phone call, Edwards asked if anyone in the house had a driver's license. Dunn said a friend named Tenisha had a license. Edwards asked if Dunn and Tenisha could come with him to help him pick up the rented van in Antioch. Dunn agreed. Cell phone records show Dunn and Edwards spoke several times that evening, including at 9:17 p.m. when they were both in Oakland.

---

postal money orders and cashing them illegally with Edwards's help. She also prepared false check stubs for Edwards to show he had been working when he had not for purposes of deceiving his probation officer.

Edwards arrived in his car and picked up the two women and drove them to Antioch.[10] Dunn's cell phone records confirm she was in Antioch at 10:54 p.m., and Edwards's cell phone records show he was in Pittsburg at 10:29 p.m. and in Antioch at 10:44 p.m. Dunn drove the van back to Oakland from Antioch while Tenisha drove back to Oakland in Edwards's car, following Dunn, with Edwards as a passenger. When Dunn stopped the van at a Safeway store parking lot to close the rear door, Edwards scolded her, saying, "Man, I told you, this van is hot."

At Edwards's direction, Dunn parked the van in East Oakland somewhere in the vicinity of 73rd Avenue. After they parked the van, Edwards then drove her and Tenisha back to Skipper's house on Brookdale. Edwards's cell phone records confirm he was back in Oakland again from 11:50 p.m. until 1:01 a.m. Later that evening, Dunn and Edwards went back to their apartment in Antioch.

Later that night or the next morning Dunn heard Edwards talking on the phone, saying he had been hanging out smoking in the parking lot of his mother's apartment complex when "some shit happened" and "some nigga got shot and some nigga got ran over." Dunn later read in the newspaper about Lavall's murder and knew that was what Edwards had been talking about.

On March 25, Dunn and Edwards picked up the van, filled it with gas, and Dunn alone returned it to Fox. The windshield was cracked and there was damage to the rear passenger door. Dunn told Fritz the van had been in an accident the day before. Dunn filled out a damage form, signing Bradley's name. Fritz knew she was not Bradley, but she took the van back into inventory and processed the damage paperwork. When the police later questioned Fritz about who returned the van, she described Dunn but did not admit knowing her.

---

[10] Dunn's cell phone records support an inference she was in Oakland from 3:47 p.m. until at least 9:17 p.m. on March 24, and in Antioch at 10:54 p.m. She was in Oakland, calling Fritz, at 11:45 a.m. on March 25.

*The Oakland murder*

When the police removed the van from the rental yard on March 27, someone at Fox called Fritz and told her that the police had been there, had found blood on the undercarriage, had impounded the van, and wanted to talk to her. Fritz then passed that information on to Bell.

Cell phone records showed a 14-minute call made from one of Fritz's phones to Edwards's phone at 11:41 p.m. on March 27. Fritz denied calling Edwards that night, but testified that Bell might have called Edwards using her cell phone. During the call she heard Bell say that "something had gone down in Antioch." The prosecutor theorized that during this call the decision was made that Bradley must be killed. On the night of March 27 Edwards also called Dunn at Skipper's house, as corroborated by cell phone records, and told her the police had picked up the rental van.

Edwards called Dunn at Skipper's house the next evening (March 28) and told her to come outside.[11] When she did Edwards was waiting in his Oldsmobile Aurora with Johnson as a passenger. Edwards told Dunn if she wanted to pick up any fresh clothes for work from their apartment in Antioch she should take BART to the Pittsburg station where he had arranged for Bradley to pick her up and take her to get her clothes.

Edwards and Johnson dropped Dunn at the Fruitvale BART station. Johnson expressed some doubt about whether Dunn should go to Pittsburg, saying to Edwards, "You sure you want to let her go, bro?" and "You sure, bro? Don't send her." But Edwards said it would be "good" or "cool" and gave Dunn money for the BART fare.

Cell phone records confirm Dunn left Oakland for Pittsburg shortly before 6:30 p.m. She made or received calls at 6:31 (near Rockridge BART), while traveling through Orinda at 6:39, in Walnut Creek at 6:49, and she connected to a cell tower in Pittsburg at 7:08 p.m., when she called Edwards.

---

[11] Cell phone records show calls at 5:31 p.m. (12 seconds long) and 5:43 p.m. (six seconds long).

Bradley was waiting at the Pittsburg station with her nine-year-old son when Dunn arrived. Dunn wanted to retrieve her clothes in Antioch, but Bradley said they had to go meet Edwards. Edwards also called Dunn, either on the way to Pittsburg or after she had arrived there, and told her to come back to Oakland with Bradley and meet him at a designated gas station on Seminary Avenue. He told her to "pull around back" behind the station.

On the way back to Oakland, Dunn received text messages from Edwards reminding her to meet him behind the gas station and saying he thought Bradley was "going to get down on us about the van" and "it's out of [his] hands." He also told her to "be on point," which she called "his favorite word." The text messages were later erased and were not available at trial. Cell phone records are consistent with both Dunn and Bradley traveling from Pittsburg to Oakland between 7:14 p.m. and 7:46 p.m. and further show that Dunn and Edwards had multiple phone conversations between 6:39 p.m. and 7:56 p.m. In one of the later conversations, Edwards told Dunn, "If something happens, get out of there."

Dunn concluded that Bradley was in danger and did not want anything to happen to her in front of her son. She told Bradley to go to Skipper's house instead of the gas station and, after talking to Edwards's mother, Renée Gray, on the phone, told Bradley to go home and handle matters with Edwards another day. Bradley left Skipper's house and took her son to his father's house in Berkeley.

Shortly after Bradley left, Edwards called Dunn.[12] When he found out Dunn was not bringing Bradley to the gas station he was angry and hung up. He soon called back

___

[12] The call from Edwards to Dunn at 7:56 p.m. lasted 32 seconds. It may be inferred this was the call in which Edwards learned that Bradley was not coming to the gas station. During the 7:56 call, Edwards's phone was accessing a cell tower near the Seminary Avenue gas station. Edwards's next call to Dunn was at 8:16 p.m., and by then he was back near the 77th Avenue house. He placed a 38-second call to Dunn at 8:18 p.m., inferably the one in which he instructed Dunn to have Bradley come back to Skipper's house. Dunn almost immediately placed a two-minute call to Bradley, complying with Edwards's instructions.

10

and told Dunn to call Bradley and have her come back to Skipper's house. Dunn complied out of fear. She then had several phone conversations with Edwards's mother, hoping Gray could put a stop to Edwards's plans. Cell phone records confirm calls made by Dunn to Gray at 8:23 p.m., 8:37 p.m., and 8:43 p.m. Dunn and Edwards talked several times between 8:21 and 8:59; by 8:53 Edwards's phone was accessing a cell tower near Skipper's house.

When Bradley returned to Skipper's neighborhood at approximately 9:00 p.m., she was not sure which house was Skipper's. She called Dunn and asked her to come outside so she could locate the house. Cell phone records show Bradley called Dunn at 8:56 p.m. and made one final call to her at 9:01 p.m.

Dunn went outside and got into the front passenger seat of Bradley's car, leaving the car door open and her feet outside the car. She asked Bradley to lend her her cell phone as a pretext to get the phone away from Bradley so the police would not find it.

Dunn saw a man she had never seen before walking across the street, approaching from behind Bradley's car. It was not Johnson. He was African American, five feet eight inches tall, wearing dark clothes, a hoodie, and a beanie. The man walked up to the passenger side of Bradley's car and asked Dunn, "Hey, little mama, what's your name?" Dunn jumped out of the car and ran back to Skipper's house.

The man shot Bradley six times, including four times in the head. He used a silver handgun. Bradley's car rolled forward, crashing into a utility pole. At 9:05 p.m. the 911 call came in regarding Bradley's car crash. Just at that time, Johnson's phone was also using a cell tower near Skipper's house, the same tower Edwards's and Bradley's phones had been utilizing.

The initial 911 call reported a traffic accident, but when police arrived to investigate it was clear Bradley had been shot. She was taken to a hospital where efforts to revive her were unsuccessful, and she died from the gunshot wounds. The actual shooter had not been identified at the time of trial.

11

Six casings were found in Bradley's car and at the scene, and a bullet slug was pulled out of the car door. Five bullets or parts of bullets were retrieved from Bradley's body.

Later that night Dunn phoned both Edwards and his mother, telling them about the shooting. Edwards did not say much in response. The next day Dunn destroyed Bradley's cell phone and threw the parts away because she did not want anyone to find out she was the last person to talk to Bradley.

### Edwards's arrest

There were outstanding arrest warrants for both Edwards and Dunn. Suspecting they may have been involved in Bradley's death, the Oakland police were on the lookout for the two. On March 29, at 6:10 p.m., they saw Edwards on the street and stopped their patrol car. As one of the officers alighted, Edwards ran and disappeared into a house on 77th Avenue.

Just at that time Dunn was arriving at the scene in Edwards's car. Edwards called her from his cell phone to ask her what was going on outside, and she told him the house was surrounded by police. Cell phone records confirm these calls occurred at 6:16 p.m-6:17 p.m.

The police ordered in a SWAT team. They ultimately persuaded Edwards to come out of the house, but instead of surrendering he entered a crawl space under the house that was filled with water. Police fired tear gas into the crawl space and Edwards ultimately came out, soaking wet and muddy.

While police had Edwards in the back of a patrol car, Gray, SyreetaVines (the mother of Edwards's baby), Edwards's sister, and Dunn all approached them, trying to communicate with Edwards. The police allowed Vines to give telephone numbers to Edwards so he could call them from jail. The telephone numbers were also taken down by the arresting officer and would later be used to identify Edwards as the inmate who made calls on a jail pay phone to the phones of the women.

Dunn was arrested at the scene on an outstanding warrant and brought in for questioning. She told the police she was sitting with Bradley in her car just before she

12

was shot and that they had been heading to the gas station on Seminary Avenue to meet Edwards so Bradley could sign "some papers." Otherwise she admitted no involvement. She was released the next day, but the police kept her cell phone.

A search of the crawl space under the house on 77th Avenue turned up a cell phone buried half a foot deep in mud. This was the phone Edwards had been using. A search of the house turned up a nine-millimeter semiautomatic pistol.

An expert criminalist testified the shell casings recovered from the Antioch and Oakland murder scenes were all fired from the same gun,[13] but it was not the pistol recovered from the house on 77th Avenue in Oakland. The murder weapon was not introduced at trial.

The rear unit of the duplex on 77th Avenue where Edwards sought refuge was rented by Bell. In the home when Edwards bolted in were Fritz and two other people, Willie Ward (a friend of Bell's) and Fritz's baby. (Bell was not at home .) About ten minutes after Edwards ran in, and before he surrendered, Fritz and Ward left the house with Fritz's baby. The two adults were put into the back of a police car and a family member came and took the baby. Fritz was released after Edwards was arrested.

Fritz testified she had two cell phones and had lent one of them to Bell. After she was released she began making calls on one of her cell phones, possibly the one that Bell had borrowed, trying to locate Bell and her baby. There were numbers on her phone's call list without names associated, apparently the phone numbers of people who had called Bell or whom he had called when he was using the phone. When she dialed one of the numbers the man on the line told her not to tell the police anything about him when they talked to her: "Keep my name out of your mouth. You don't know me." Fritz thought the voice sounded like either Edwards or Johnson, but she was not sure which.

---

[13] All six bullets recovered from Bradley's body and at the scene of her murder were also fired from a single gun. The bullet recovered from Lavall's chest may have been fired from that same gun, but there were too few markings to make a definitive determination.

13

Since Edwards was in custody (and his cell phone was buried) it may be inferred that the speaker was Johnson.

*Edwards's phone calls from jail*

After Edwards was arrested he made a series of phone calls from jail to various parties. Sixteen recorded conversations were introduced at trial. They recorded Edwards talking on a pay phone in the jail to the numbers given to him by the women who approached the patrol car when Edwards was arrested. Many of the calls were made to Gray's phone, but other parties would be patched into a three-way call.

The prosecution's theory was that the calls—often involving improvised codes which even the parties to the conversation had trouble understanding—showed that Edwards was deeply concerned about the police investigation into the Antioch and Oakland murders at a time when he was only being held on an unrelated warrant.

The calls show that Edwards arranged to have Dunn dispose of a black nine-millimeter gun.[14] The prosecutor was unsure whether this gun was used in the Antioch crimes, as both Denton and Dunn described the weapon used in the shootings in Antioch and Oakland as being chrome or silver color. It is possible, however, that the black gun was used by the second gunman in Antioch.

It was also clear from the phone calls that various people around Edwards were questioning what Dunn may have told the police, with mounting suspicion that she would "crack."[15] Edwards reminded her to "stay solid" for "the team." Edwards was also

---

[14] In a recorded jailhouse telephone conversation on March 30, Edwards told an unidentified woman, "The keys to my house in the car man, I got a gun in there man, and I need to have somebody go grab that." In another conversation two days later, Edwards asked Dunn to whom she had sold the "black pager." She told him she had sold it to her cousin's partner. Dunn testified this referred to a black nine-millimeter handgun they kept in their apartment in Antioch.

[15] On March 31, Edwards talked to Vines, who told Edwards that Dunn was "talking too much." On the same date, Johnson told Edwards that "Boo Boo" (Dunn) needed to "tuck her feather until this shit is over with . . . ." and Dunn "need to get up out of here . . . [¶] . . .[¶] 'til all this shit is over with . . . ."

14

worried whether there was video footage of him at Fox, but proposed to have Fritz retrieve any such evidence.[16] He and his friends conferred on eliminating Denton as a witness (calling him "J. Jonah" and characterizing him as a "loose duck"). Edwards was concerned whether the police would find out about his "trip to Cancun" (which the

---

On April 1, Bell told Edwards, "Shorty [Dunn] needs to cut." Edwards responded, "Moms gonna make sure she all right" Bell told him to "stay out of contact" with Dunn "as much as possible." When Edwards told Johnson to tell Nate (Bell) to "make sure his legs [Fritz] on point," Johnson responded that Bell said, "make sure *your* legs on point."

That same day Johnson warned Edwards that "Shorty" (Dunn) "need to get up out of here" because the police "gonna grab her this time and its gonna be bad." Johnson warned that "its gonna be real pressure this time." Johnson later told Edwards "we gotta keep Boo-Boo solid."

When Dunn came back into the conversation Edwards admonished her that next time she got picked up by the police ("next time . . . they come grab you") there should be "no talking or none of that." In a call the next day he reminded Dunn to "stay on point" and not to "crack under no pressure."

On the night of April 1, Edwards encouraged Dunn to "ride this one out for the team." When she "[made] it through this" she would "be really one of us" and be "really part of the firm."

In another phone call Edwards told Vines to keep an eye on Dunn. By April 4, 2006, Gray told her son that they were trying to "figure out what's going on with Meka." Gray said she was "on top of her ass." Johnson was worried about the "duck on the pond," meaning Dunn. He said "she don't give a fuck about no team." Edwards told Johnson to "handle it" and that it was "out of [his] hands." Johnson said, "you know we all in this shit bro."

Edwards then called Dunn and told her "the team" was telling him that Dunn was "acting like a straight mark" and had said "fuck the team." Dunn denied being disloyal. Edwards said he was "not even supposed to be saying nothing to you," but he did not "wanna see a motherfucker go out like that."

[16] In a conversation with Bell on April 1, Edwards asked whether the police had any "naked pictures" of "us" "down there" and told Bell to get his "legs" (Fritz) to "grab any film down there of us, bro, for the team, bro" and to "get any . . . footage of us at Cancun."

On the same date Edwards expressed concern to Dunn about "[t]he pictures at Cancun," but Dunn reassured him. He wondered how they got the pictures of him and his "baby mama at Cancun, off the . . . back a the boat." He concluded it was "just the regular paparazzi scene."

prosecution theorized was a reference to the Antioch crimes and sometimes to Fox rental),[17] and whether they would be able to connect up the two crimes.[18] He constantly reminded everyone to "stay on point" for "the team." He worried about cell phone evidence. The calls also show that Johnson and Edwards spoke frequently and proclaimed their love for one another and their loyalty to "the team."

On April 1, 2006, Dunn told Edwards the police did not know the Antioch and Oakland crimes were related: they had not put all of the "pieces" together.[19] In that same call she told Edwards the police had recovered his "muddy" cell phone.[20]

Shortly after that call, Edwards called Johnson and the following dialogue was recorded:

Edwards: "Do you know they ain't even, uh . . . bro, you know how the, uh, first trip we went on, to Cancun, bro?"

_____

[17] Edwards warned that "mother-fuckers gotta be like . . . man, like . . . a mother-fucker never took a trip . . . to Cancun." In a phone call on April 1, he told Dunn "all them . . . people gotta do is say you was at Cancun . . . it's gonna be problems." Cancun in this instance probably referred to Fox rental. Edwards told Dunn that if others did not cooperate in saying she was not present in Cancun, "just let me know and—and stuff will be taken care of, you hear me?"

[18] In a call on April 1, Dunn told Edwards the police did not know about the "initial" or "first" pictures (i.e., the Antioch crimes). Edwards responded, "They just know about the . . . outcome from the first pictures" (i.e., the Bradley murder). Dunn said, "Right." Edwards expressed concern that "when they get the other pictures of me and my baby mama . . . and, and put that picture . . . together . . . and find out who that other woman is that . . . that's my big . . . my wife gonna want a divorce, huh?" Dunn said, "Yep." He compared such an event to the fall of the "Twin Towers." But Edwards pointed out that "the real key to everything is . . . no longer available," which was no doubt a reference to the fact that Bradley was dead.

[19] Dunn talked about a "boat trip" during a call on April 1, by which she intended to convey to Edwards that the police questioned her about her ride with Bradley from the Pittsburg BART station to Oakland, but they did not question her about the van rental or a murder in Antioch. Dunn tried to convey the same thing to Edwards by telling him they did not know about the "other party," which referred to the Antioch crimes.

[20] Edwards said he had broken his phone, but Dunn told him the police had shown it to her and it was "all muddy." Edwards said it should have been broken "from all the dirt and stuff."

16

Johnson: "Yeah."

Edwards: "They ain't even . . . they ain't even found out that trip got something to do with the trip to Mexico, bro, yet."

Johnson: "They don't know?"

Edwards: "Huh?"

Johnson: "They don't know, huh?"

Edwards: "No."

In a phone call on April 3, 2006, Vines told Edwards she was "stressed" because there was "so much evidence." The "manager" in Antioch had been "talking" and said he saw "three people," "two darks and one light." She told Edwards "they traced the van . . . to the girl, and um, when they got to her, she was, you know." Edwards said, "Yeah."

The call recorded on April 5, 2006, was a fairly clear discussion about killing Dunn to eliminate her as a witness. Johnson told Edwards that he and some associates—identified by nicknames—got together and talked about "survive shit" and "they ain't gonna just get off this shit." Dunn, he suggested, could even cause problems "two or three years from now" and could "end up getting grabbed and cracking later on."

Edwards tried to argue she should not be killed, talking about the "loss" he had just taken "for the team," an apparent reference to Bradley's death. Johnson expressed doubt that Dunn would take a long prison sentence and stay loyal to Edwards (i.e., "what bitch you know that's, that solid out here bro?").

Edwards at one point said he was "putting it in [his] brother's hands . . . ." Johnson told him, "it ain't really just your call right now . . . 'cause it's kind of ugly right now." Johnson said "the team thinking about keeping this shit gangster." They were trying to buy a "car" needed for "this kind of situation"—which the prosecutor interpreted as a gun— and that was "the only problem last night." Johnson said they were "moving fast" " 'cause we ain't got no time to be wasting." "[W]e ain't got time to be worried about no feelings." Johnson later said, "We didn't even need to let last night go by man, that's how serious this" is.

17

As Edwards continued to resist, Johnson advised him to "rap with Mo" Skinner, a fellow jail inmate awaiting trial for a double murder. Two witnesses in Skinner's case had been murdered while he was awaiting trial. Johnson predicted that Skinner would tell Edwards he "don't know what you mean about witnesses."

On April 14, Oakland police warned Dunn they had intercepted calls which were threatening to her and suggested she take it seriously. Dunn initially still failed to identify Johnson in a photo lineup, but she eventually admitted she knew him as "Koont" and picked out his photo. From then on she changed the way she related to Johnson because she "did not want to end up dead." She left town as often as possible and tried to stay away from Oakland and Antioch.

But Dunn was also still loyal to Edwards. She told him after the interview that the police were recording the phone calls and they must stop talking on the phone. The last recorded phone call in evidence was one to Edwards's mother on the night of April 7, 2006. Gray told Edwards that the police had some "pictures" of "the rentals" and were getting ready to "snatch Meka up" and question her "about the rentals."

Edwards was transferred to a different facility in connection with his unrelated matter and was arrested on August 3, 2006, for the crimes in this case. Johnson was arrested on July 20, 2006, when he was hospitalized with a gunshot wound. Dunn was arrested on August 1, 2006, at her place of work. Fritz was arrested in November 2007 on a murder warrant but was never charged.

### *The proceedings below*

Edwards and Johnson both were charged with murder of Lavall and attempted murder of Denton, with a special circumstance allegation of murder in a kidnap attempt. In connection with both counts it was alleged that Johnson personally used a firearm (former §§ 12022.5, subd. (a)(1), 12022.53, subd. (b)), and he was charged in a separate count with being a felon in possession of a firearm based on a 2003 conviction for sale or transportation of marijuana. (Health & Saf. Code, § 11360, subd. (a).) Both men were also charged with murder of Bradley, with special circumstance allegations of elimination of a witness, lying in wait, and multiple murders.

18

Dunn was originally charged as a principal in Bradley's murder, with lying in wait and elimination of a witness alleged as special circumstances. She was charged as an accessory after the fact in the Antioch crimes. She later entered into a plea bargain with the district attorney, as described in footnote 9, *ante*. She decided to cooperate with the prosecution after she saw Bradley's son testify at the preliminary hearing.

The case was tried before a jury beginning February 8, 2010, with testimony taken over 14 days. Edwards presented one defense witness, his sister, who testified that Bradley had been like a "second mom" to him since childhood and they had an affectionate relationship. Johnson presented no evidence. The defendants did not testify.

On March 19, 2010, Johnson and Edwards both were convicted of all charges and all special allegations were found true, but the attempted murder of Denton was found to be without premeditation and deliberation. On June 4, 2010, both defendants were sentenced to life terms without possibility of parole for the murders.

## DISCUSSION

### *Asportation*

Defendants' first claim is that there was insufficient evidence of asportation to support the kidnapping special circumstance finding.[21] They rely largely on *People v. Martinez* (1999) 20 Cal.4th 225, which held that simple kidnapping (§ 207, subd. (a)) requires asportation as an element, and has these passages: "nothing in the language of section 207(a) limits the asportation element solely to actual distance." (*Id*. at p. 236.) "[T]here is no minimum number of feet a defendant must move a victim in order to satisfy" the asportation requirement. (*Id*. at p. 233.) Rather, the finding of asportation includes "consideration of the 'scope and nature' of the movement and the increased risk of harm to the victim." (*Id*. at p. 236.)

But we apply the special circumstances statute, not the kidnapping statute itself. And that statute reads: "The penalty for a defendant who is found guilty of murder in the

---

[21] This claim was raised in Edwards's opening brief and was joined in by Johnson.

first degree is death or imprisonment in the state prison for life without the possibility of parole if one or more of the following special circumstances has been found under Section 190.4 to be true: . . . (17) The murder was committed while the defendant was engaged in, or was an accomplice in, the commission of, attempted commission of, or the immediate flight after committing, or attempting to commit, the following felonies: . . . (B) Kidnapping in violation of Section 207, 209, or 209.5." (§ 190.2, subd. (a)(17)(B).) The prosecution did not proceed on the theory that a completed kidnapping had occurred, but rather on the theory that the murder occurred during an *attempted* kidnapping.

An attempted kidnapping occurs if the defendant specifically intends to commit a kidnapping and takes a "direct but ineffectual" step toward its completion. (*People v. Medina* (2007) 41 Cal.4th 685, 694-695; *People v. Cole* (1985) 165 Cal.App.3d 41, 47-48; § 21a.) Asportation is *not* an element of attempted kidnapping. (*People v. Cole*, *supra*, 165 Cal.App.3d at p. 50; *People v. Fields* (1976) 56 Cal.App.3d 954, 957.)

Here, intent to kidnap was clear from the gunmen's commands that the victims get into the van, and a direct but ineffectual step toward its completion was surely shown by evidence that the gunmen used guns and physical force to move the victims toward the van. There can be no doubt that an attempted kidnapping occurred. Nor is there any reason to believe the defendants intended to move Lavall and Denton only five or ten feet into the van and then leave the van parked in the parking lot. Undoubtedly the purpose of getting them into the van was to take them somewhere else, inferably a substantial distance away, for what purpose we may only surmise. What is clear is that the *intended* asportation was for an appreciable distance, meeting the legal requirement for a kidnapping. (*People v. Fields*, *supra*, 56 Cal.App.3d at p. 957.)

The evidence was more than sufficient to show the murder occurred while defendants were "engaged in" an attempted kidnapping—or perhaps more precisely, that they committed the murder in flight from such an attempt when they ran over Lavall as they fled the scene. Either way, there was ample proof of an attempted kidnapping.

20

### *Accomplice testimony and sufficiency of the evidence*

Edwards argues the evidence was insufficient to support his conviction on counts one and two, and even if it was sufficient, it came in solely through the uncorroborated testimony of Dunn, an accomplice.[22] He therefore attempts to rely on the accomplice testimony rule to claim there was insufficient corroboration. Johnson joins in these arguments.

The law governing a claim of insufficiency of the evidence is well-settled. "[T]he the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (*Jackson v. Virginia* (1979) 443 U.S. 307, 319.) To determine whether there was substantial evidence to support the judgment we resolve all conflicts and draw all reasonable inferences in its support. (*People v. Nguyen* (1993) 21 Cal.App.4th 518, 528-529.) "Substantial" evidence is that which is " 'of ponderable legal significance . . . reasonable in nature, credible, and of solid value." (*People v. Johnson* (1980) 26 Cal.3d 557, 576.)

The argument about corroboration is based on section 1111, which provides: "A conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof. An accomplice is hereby defined as one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given." The reason for the rule is manifest: "Of course, an accomplice has a natural incentive to minimize his own guilt before the jury and to enlarge that of his cohorts; accordingly, the law requires an accomplice's testimony be viewed with caution to the extent it incriminates others." (*People v. Brown* (2003) 31 Cal.4th 518, 555.) The corroboration need only be "slight."

---

[22] Edwards specifically argues that the evidence was insufficient to support the conviction of the "Antioch murder." The same arguments would apply to the Antioch attempted murder, and we read the brief as challenging that count as well.

(*Id.* at p. 556; *People v. Gurule* (2002) 28 Cal.4th 557, 628; *People v. Cooks* (1983) 141 Cal.App.3d 224, 258.)

The accomplice testimony rule was explained to the jury in the court's instructions, and Dunn was identified as an accomplice to count three as a matter of law.

Turning first to the Antioch crimes, the murder of Lavall and the attempted murder of Denton, the accomplice testimony rule arguably does not apply at all, because Dunn was not charged as a principal in the Antioch crimes, but rather as an accessory after the fact. (*People v. McKinzie* (2012) 54 Cal.4th 1302, 1353; *People v. Daniels* (1991) 52 Cal.3d 815, 867 ["mere accessories are not accomplices under section 1111"]; §§ 31-32.) There was no evidence that Dunn was involved in the Antioch crimes except for her role in returning the van to Oakland.[23]

But even if she were considered an accomplice, as demonstrated above the convictions were not dependent entirely upon Dunn's testimony. They were supported by corroborating evidence. With respect to Johnson's role in the Antioch crimes, Denton identified him as the man who held him at gunpoint. Denton's identification, of course, was independent of any accomplice testimony and was sufficient by itself, and especially with the circumstantial evidence, to support Johnson's convictions. (*People v. Boyer* (2006) 38 Cal.4th 412, 480; Evid. Code, § 411.) Johnson's cell phone records also strongly suggest he accompanied Edwards to Antioch on the date and at the time of the Lavall murder. (See fn. 6, *ante*.)

There was also other evidence tying Johnson to the crime, including his warning to Fritz on the phone to keep his name out of any conversations with the police. Fritz was being questioned by police with respect to the van used in the Antioch crimes, as to which Johnson should have had no worries unless he was involved. Statements by Johnson himself on the jail phone recordings also show knowledge of the Antioch crimes

---

[23] Edwards's trial counsel argued that it could have been Dunn who drove the van during the Antioch crimes. Dunn denied at trial that she had any part in those crimes. Her cell phone records also show she was in Oakland at 3:47 p.m. and at 5:39 p.m. on March 24, talking to Edwards, who was in Antioch at both times.

22

and plans to eliminate witnesses. There was more than sufficient evidence to convict Johnson on counts one and two.

Although Edwards was not identified by any eyewitness as having been involved in the Antioch crimes, there was circumstantial evidence against him going well beyond the testimony of Dunn, including this: (1) Fritz testified he was involved in Bradley's rental of vans from Fox; (2) Fritz saw Edwards driving one of the rented vans around Oakland ; (3) the last van rented for Edwards's use unquestionably was the murder weapon based on matching blood on its underside; (4) Fritz overheard Bell say to someone on the phone that something "went down" in Antioch, inferably having to do with the rented van, and cell phone records support an inference that the person on the line with him was Edwards; (5) cell phone records confirmed that Edwards was in Antioch at the time of the crimes (see fn. 6, *ante*); (6) cell phone records corroborated Dunn's testimony that she and Edwards both went to Antioch on the night of March 24;[24] (7) Edwards's mother lived in the apartment complex where the crimes occurred; (8) Edwards ran when the police arrived to arrest him and buried his cell phone under the house; and (9) in jail phone conversations Edwards admitted his own participation in the Antioch crimes in coded language (Cancun) and discussed getting rid of the surviving witness. There was more than sufficient corroboration to allow the jury to use accomplice testimony in assessing guilt.

Adding in Dunn's testimony makes the evidence even stronger, as it shows the lengths to which Edwards went in distancing himself from the van. He enlisted Dunn's

---

[24] Edwards argues evidence of phone calls made to or from Dunn's cell phone cannot be considered evidence derived from a non-accomplice source because Dunn herself authenticated the phone records as hers. But Lieutenant Brian Medeiros also identified Dunn's cell phone as having been taken from her at the time of the first police interview. The name given when the cell phone was purchased was Meka Duan (i.e., Dunn). Cell phone records could be identified by the phone's serial number  and were obtained via a search warrant. A Metro PCS employee authenticated the call records for that phone. Lieutenant Medeiros put together a spreadsheet (Exhibit 41) showing the chronology of calls of interest, together with cell tower information. The evidence of cell phone calls came from sources other than Dunn.

aid in retrieving it, even though she was an unlicensed driver, and had her return it to Fox and pretend to be Bradley. In addition, Edwards told Dunn the van was "hot," and she heard him describe the Antioch crimes over the phone, including that he had been present at his mother's apartment complex when one "nigga" got shot and one "nigga" got run over.

The convictions of Johnson and Edwards on the Antioch crimes were supported by substantial evidence with or without Dunn's testimony. Likewise the murder of Bradley in Oakland.

As for the Bradley killing, the above factors gave both Edwards and Johnson a motive to eliminate Bradley as a witness. Fritz's testimony showed she learned of the van's impoundment on March 27, she told Bell, and Bell subsequently talked to someone on the phone (inferably Edwards) about something that "went down" in Antioch. It may be inferred that Johnson also knew about the van's impoundment and shared Edwards's motive to get rid of Bradley, as there were several calls between Johnson and Edwards, as well as between Johnson and Bell, on the morning of March 28.

Bradley's son partially corroborated Dunn's testimony in that he confirmed Bradley knew Edwards, his mother, and "Meka." He testified that his mother drove Dunn from BART to Oakland, and the women used their cell phones during the trip. The three of them stopped at a house in the Fruitvale district of Oakland before Bradley was killed. The boy was even able to guide the police to Skipper's house on Brookdale Avenue, where his mother had dropped Dunn.

Dunn admitted she helped set a trap to have Bradley killed. The cell phone records confirmed her description of how the trap came into being by corroborating her movements to and from Pittsburg on March 28 and the various phone calls she described.

The corroboration of Dunn's movements and cell phone calls was not merely confirmation of innocent details of Dunn's day, as Edwards attempts to argue on appeal. This was part of a murder plot. The cell phone records confirmed not only Dunn's own travels, but they reflected a phone call from Edwards to Bradley at 5:24 p.m. (when Bradley was in Antioch) that inferably was the one instructing Bradley to meet Dunn at

24

the Pittsburg BART station.  Other phone records showed multiple calls between Edwards and Dunn during Dunn's trip to and from Pittsburg.

Cell phone records further showed that both Edwards and Johnson were where they needed to be to carry out the plot, both when the plan was to lure Bradley to the Seminary gas station, and when the plot finally came to fruition.  Lieutenant Medeiros testified on the basis of the cell phone records that the "muddy phone" (Edwards's) connected to a cell tower near the Seminary Avenue gas station at 7:56 p.m., and 40 seconds later Johnson's phone "was hitting the same cell tower . . . ."  Those records are sufficient corroboration that Edwards and Johnson were waiting together at or near the gas station for Dunn to deliver Bradley to them.[25]

Edwards's phone was again accessing a cell tower near the 77th Avenue house at 8:16 p.m., and Johnson's was also accessing the same cell tower at 8:28 p.m., again suggesting the two men were traveling together.  Both Johnson's and Edwards's cell phones were utilizing the same cell tower near the 77th Avenue house at 8:42 p.m.

And they were on the move.  Both Johnson's and Edwards's cell phones were in the vicinity of the killing on Brookdale Avenue when it happened.  Bradley accessed the cell tower at 3701 High Street (near Skipper's house) at 9:01 p.m., Edwards accessed it at 8:59 p.m. and again at 9:04 p.m., and Johnson accessed it at 9:05 p.m.  Thus, the cell phone records corroborated Dunn's testimony about the sequence of events and the phone calls that were exchanged, establishing that Johnson and Edwards had the opportunity to commit the murder.

---

[25] We deny Johnson's request to take judicial notice of the geography of East Oakland.  Instead we had transferred from the trial court Exhibit 1LLLLL, a map of Oakland showing the relevant cell towers.  We disagree with Johnson to the extent he suggests the cell tower records were meaningless.  The jury was aware that cell towers may be accessed within a radius of approximately one and one-half to two miles and the limits of precision in identifying the caller's geographical location when dealing with such records.  It was the jury's job to assess the weight to be given the phone records, but we believe they were highly probative.  It was not a single call that tended to show Edwards and Johnson were together on the night Bradley was killed, but rather the *pattern* of towers accessed by their phones that suggested they were traveling together.

But there is more.  Edwards ran when the police car pulled up to arrest him and hid his cell phone in the mud under Bell's house, showing consciousness of guilt.  These were Oakland police officers, and his response was most likely related at least in part to his fear of being tied to participation in the Oakland murder.  Thus, the flight and disposal of the cell phone tend to corroborate Edwards's participation in Bradley's murder.

As for Johnson's role in the Bradley murder, Johnson was (according to Dunn's testimony) in the company of Edwards when they went to the Fruitvale BART station on the evening of Bradley's murder.  Johnson seemed to know in advance something about the murder plot because he urged Edwards not to send Dunn to the Pittsburg BART station.   Johnson argues that this shows he tried to dissuade Edwards from killing Bradley, while the Attorney General argues it shows he thought Dunn could not be trusted to participate in the murder plot.  The jury was free to resolve that ambiguity in favor of the prosecution.

In addition, specifically with respect to Johnson, the same gun used in the Antioch murder was used in the Oakland murder.  Both the gun pulled on Denton and the gun used in the Bradley murder were silver in color.  It may be inferred that the same person who used the silver gun in Antioch provided it to the person who shot Bradley.  According to Denton's testimony that was Johnson.  The gun that Edwards disposed of was black, so his was not the gun that killed Bradley.  Johnson's connection to the silver gun also connects him to Bradley's murder.

Finally, of course, there were the jailhouse phone calls made by Edwards, in which he and Johnson discussed their trips to "Cancun" and "Mexico," suggesting that both men participated in both crimes.  Dunn testified that Johnson was calling her virtually every day after Edwards was arrested, showing a great interest in making sure she was "on point."  The jail phone calls confirmed his concern about that.  Dunn possessed significant information relating to Bradley's murder, but much less information about the Antioch crimes.  It is not clear that Johnson even knew she helped Edwards get the van back to Fox.  Thus, Johnson's concern about what Dunn might disclose if she "cracked" under police pressure most likely shows a consciousness of guilt about the Bradley

26

murder.  In light of the entire body of evidence, there was sufficient corroboration of Dunn's testimony, and the evidence was sufficient to support the convictions.

*Judge's questioning of a witness*

Next Johnson argues that the judge acted improperly when he questioned a prosecution witness in response to a jury request.  The facts are as follows:

The judge informed the jury before opening statements that they could pose questions to be asked of a witness and that he would do the actual questioning:

"I have talked to you, suggested, hinted, that as jurors you will be allowed to ask questions.  Your right to ask questions stems from my right to ask questions.  Therefore, I will limit it the same way I would limit my own right.

"Neither you nor I call witnesses.  I can't expect someone to say 'We would like some testimony about this issue' or 'Please call this witness.'  The right to ask questions is limited to who is on the stand. . . . [¶] . . . [¶]

"The way we would do that, we would expect you to write the question down on a blank piece of paper from your notebook.  Get the attention of my bailiff.  She will take the note, get it to me.  I will always try to make sure all of the lawyers have seen it.  They have the right to object to my questions or your questions also, before I do anything about it, then I will ask the question and *may ask several questions I can think of so that the question you've asked is fully answered.*

"You will pick up when that happens, if I'm asking more than one question, that I have other questions from jurors or something, *I just want to make sure there is a full follow-up to anything that you've asked.*"  (Italics added.)

This procedure was in fact employed by the judge when a juror later asked a question relating to the identification of Johnson.  Specifically:

When Denton testified at trial he described the man who held a gun on him as having two-inch dreadlocks or "little twisties."  He did not mention anything about gold teeth, either in describing the gunman at trial or in explaining his lack of certainty regarding the identification.  Later in the trial, Officer Mike Franzen of the Antioch Police Department, who had interviewed Denton in the hospital shortly after the shooting,

was called as a prosecution witness. He testified that in the hospital interview Denton had described his assailant consistently with his trial testimony, but Denton also said the would-be kidnapper had "top and bottom gold teeth showing."

Following the cross-examination of Franzen, Edwards's trial counsel noted there was a question from a juror. The question read, "Denton said there was gold on top and bottom teeth—fillings in the back teeth or front teeth?" The juror evidently was concerned that Johnson had no gold teeth visible in the courtroom or in photos in evidence and was trying to explore how this apparent inconsistency might affect the accuracy of Denton's identification of Johnson.

The court did not read the question aloud but questioned the witness as follows:

"THE COURT: You have mentioned that in the description Johnny Denton gave, there were references to one or more gold teeth.

"WITNESS: Yes.

"THE COURT: In the mouth of one of the gunmen.

"WITNESS: Correct.

"THE COURT: Did you ever look at Mr. Johnson to see if he had any gold teeth?

"WITNESS: Yes.

"THE COURT: And what did you see?

"WITNESS: Well, I met with him personally at the hospital, there were no gold teeth.

"THE COURT: And did you do anything to follow-up on looking for someone with a gold tooth or gold teeth?

"WITNESS: I did not.

"THE COURT: Are you familiar with anything along the lines of people who would wear false gold teeth?

"WITNESS: Yes.

"THE COURT: What about that?

"WITNESS: They are referred to as 'gold grilles.' They are removable teeth that make it appear like you actually have gold teeth, but they are removable.

"THE COURT: Now, there's also been references to hair and dreadlocks and stuff, people wear wigs, right?

"WITNESS: Correct.

"THE COURT: Was that one of the reasons you would say, focus on something other than the hair?

"WITNESS: Yes.

"THE COURT: Now, people can have various kinds of wigs, but it is usually specifically to change their appearance.

"WITNESS: That's correct.

"THE COURT: A gold grille may change someone's appearance, but also is it true it is also something in certain lifestyles and certain guys is a way to show status?

"WITNESS: Yes. I believe it's considered an enhancement.

"THE COURT: Like wearing expensive jewelry, males or females may choose to wear bling or nice looking jewelry to decorate themselves, and it shows a certain level of success?

"WITNESS: I think that's accurate.

"THE COURT: So if somebody was choosing to wear a grille, it wouldn't necessarily be just a disguise, it's [*sic*] just may be something they wear on occasion?

"WITNESS: I believe that's a fair characterization.

"THE COURT: Okay. But as far as you know, for purposes of what he was describing as somebody with one or more gold teeth. Mr. Johnson, you never saw with a grille or real gold teeth or anything like that.

"WITNESS: That's correct.

"THE COURT: Okay. I think that covers the area. But if not, redirect?

"[THE PROSECUTOR]: No, thank you."

Johnson's counsel did not object to the court's questions while Franzen was on the witness stand. Franzen was excused at 3:22 p.m. Another witness testified from that time until 4:15 p.m., when the court ordered the proceedings recessed until the following

29

morning.  After the jury left, Johnson's defense counsel stated an objection regarding the court's questioning of Franzen.

"[JOHNSON'S COUNSEL]:  On behalf of my client, we would like to object to the court's posturing questions, I guess, to Detective Franzen about twisties or dreads, wigs, that that was probably unduly prejudicial to the jury in light of the fact the issue came up in opening. And that it was not something that was apparent in the testimony presented by Detective Franzen or Johnny Denton.

"THE COURT:  Is the objection that I brought up a subject of wigs, or did I ask any of the questions about grilles or wigs?

"[JOHNSON'S COUNSEL]:  The manner in which the court framed the questions as if it were directing the jury to disbelieve what other people had testified to, or to cause undue light on Mr. Johnson in that regard.

"THE COURT:  He's the one who was identified by Mr. Denton. I didn't ask anything—didn't plan to ask anything until we had a question from the juror about gold teeth.  So what I was trying to do was clarify whether [Franzen] did anything about the idea that they should be looking for somebody with gold teeth.

"The analogy about wigs and twisties, people may wear wigs, especially men, to hide their hair appearance, but gold teeth are often a decoration, and that's not something one would do to hide it.

"And as I recall, as I was trying to get into his part about gold teeth, I wanted him to understand that—I wanted—I specifically highlighted, I thought for the benefit of the defense, not in some way to point it out since he's the only one who has been identified in a meaningful way . . . .

"But he had a meaningful I.D., and the last question was a question that emphasized this man knew nothing about finding anything to do with wigs or grilles that points out Mr. Johnson.  And he agreed.

"So I thought that I was trying to be as balanced as I could and go to the juror's question about gold teeth and what do you do with them, and sometimes people wear

30

them all the time as a decoration, that a suspect might not even be trying to mislead and just have a grille on, as opposed to having a wig on, which would mislead.

"You know, robbers wear—quite often, they will wear masks and they will wear wigs, but people wear grilles all the time. But that's what I thought I was doing. I don't think the jury would take it any differently. I'm not even sure if counsel did, but you are mentioning your client doesn't like it.

"That's fine. Your objection is overruled. I don't think I did anything inappropriate. I think I was, in fact, very balanced about it, but I'm not the last one who can have an opinion on it.

"[JOHNSON'S COUNSEL]: Thank you, Judge.

"THE COURT: And I'll be happy to remind everybody—I will tell the jury one of the last things they will hear is 'take no cue from me,' so you are free to remind them of that in argument too. Okay.

"[JOHNSON'S COUNSEL]: All right. Thank you, Judge."

The judge did instruct the jury more than once that it should not take anything he said or did during the trial, including any questions he may have asked, as an indication of what he thought about the facts or witnesses.

Generally, a defendant must timely and specifically object to trial court error in order to preserve the issue for appeal. (Evid. Code, § 353.) That rule applies to issues relating to a judge's questioning of a witness. (*People v. Hines* (1997) 15 Cal.4th 997, 1041; *People v. Corrigan* (1957) 48 Cal.2d 551, 556 ["a judge's examination of a witness may not be assigned as error on appeal where no objection was made when the questioning occurred"].) The objection in this case was insufficient to preserve the issue for appeal because it lacked specificity.

First, the objection as quoted above did not specifically challenge the judge's questioning about gold teeth or grilles.[26] Counsel for Johnson mentioned only the

---

[26] To the extent Edwards seeks to join in his co-defendant's arguments, we note he made no objection in the trial court, and the issue has been forfeited. In any case, the

questioning about "twisties or dreads, wigs" as being "unduly prejudicial" and "posturing." Thus, counsel never did object to the specific questions about gold grilles that seem to form the backbone of his issue on appeal. Johnson now claims the judge's questions were "leading," but no objection was ever raised on that ground.

In any case, we find no merit in Johnson's contention. It is well established that a court may permit jurors to submit questions to be asked of witnesses. (*People v. Majors* (1998) 18 Cal.4th 385, 406-407; *People v. Cummings* (1993) 4 Cal.4th 1233, 1305; *People v. Anderson* (1990) 52 Cal.3d 453, 481.) Either the judge or counsel who called the witness may then proceed to ask the juror's proposed question. (*People v. Majors*, *supra*, 18 Cal.4th at p. 407; *People v. Cummings*, *supra*, 4 Cal.4th at pp. 1304-1305.) But the examination need not be limited to the juror's precise question.

" 'The law of this state confers upon the trial judge the power, discretion and affirmative duty . . . [to] participate in the examination of witnesses whenever he believes that he may fairly aid in eliciting the truth, in preventing misunderstanding, in clarifying the testimony or covering omissions, in allowing a witness his right of explanation, and in eliciting facts material to a just determination of the cause.' " (*People v. Carlucci* (1979) 23 Cal.3d 249, 256; see also Evid. Code, § 775 [allowing judge to "call witnesses and interrogate them the same as if they had been produced by a party to the action"].)

"In asking such questions, however, 'the trial court must not undertake the role of either prosecutor or defense counsel.' (*People v. Carlucci*, *supra*, 23 Cal.3d at p. 258.) 'The examination should relate to material matters and be conducted impartially, so that the jury will not receive improper inferences as to the judge's opinions on the case.' (3 Witkin, Cal. Evidence [(5th ed. 2012) § 94, p. 148]; see also *People v. Camacho* (1993) 19 Cal.App.4th 1737, 1744.) 'The trial judge's interrogation "must be . . . temperate, nonargumentative, and scrupulously fair." ' (*People v. Hawkins* (1995) 10 Cal.4th 920, 948.) The judge 'may not ask questions to convey to the jury his opinion

---

questioning pertained to the identification of Johnson and was clearly nonprejudicial as to Edwards.

of the credibility of a witness' (*People v. Rigney* (1961) 55 Cal.2d 236, 241) and 'must not become an advocate for either party' (*ibid.*)." (*People v. Harris* (2005) 37 Cal.4th 310, 369 (dis. opn. of Kennard, J.) (*Harris*).)

We construe Johnson's claim as a species of judicial misconduct, which is reviewed for abuse of discretion. (*People v. Alvarez* (1996) 14 Cal.4th 155, 237 & fn. 35.) But we believe the judge's examination in this case simply sought to fully develop the pertinent facts, with a view toward expeditious and effective ascertainment of the truth. (*People v. Raviart* (2001) 93 Cal.App.4th 258, 270 [judge who questioned half the prosecution witnesses but who did so impartially did not commit misconduct].) The question we must decide is whether the judge " 'officiously and unnecessarily usurped the duties of the prosecutor . . . and in so doing created the impression that he was allying himself with the prosecution." (*People v. Clark* (1992) 3 Cal.4th 41, 143.) We answer that question in the negative.

The testimony elicited by the judge did not involve untruthful or misleading facts (i.e., no one questions that removable false gold teeth or "grilles" do exist). Thus, the judge's questioning seems to have been designed to " 'fairly aid in eliciting the truth,' " to " 'prevent[] misunderstanding,' " to " 'clarify[] the testimony,' " " 'cover[] omissions,' " and " 'elicit[] facts material to a just determination of the cause.' " (*People v. Carlucci*, *supra*, 23 Cal.3d at p. 256.)

The judge's questioning also brought out evidence that was helpful both to the prosecution (i.e., that removable gold teeth or grilles exist and that wigs are often worn to disguise one's appearance) and to the defense (that Franzen undertook no investigation to locate a suspect with gold teeth and that Johnson had no gold teeth or gold grilles when he was arrested). The questioning therefore must be considered "impartial" within the meaning of the case law.

The record reflects no intemperance on the judge's part. So far as the record discloses, the judge's tone was neutral. The challenged questions occurred during a very brief time in a lengthy trial. Johnson's counsel points to no other signs of the judge's claimed pro-prosecution bias throughout the remainder of the trial. (Cf. *Spruance v.*

33

*Commission on Judicial Qualifications* (1975) 13 Cal. 3d 778, 788-789, 797 [trial judge "expressed his disbelief in the testimony of a defendant by having created a sound commonly referred to as a 'raspberry' " and gave another defendant "the 'finger' "]; *People v. Mahoney* (1927) 201 Cal. 618, 621-627 [court made 23 negative remarks to defense counsel, disparaged a defense expert witness in the jury's presence, and questioned defense witnesses in a manner that demonstrated a clear bias for the prosecution]; *People v. Santana* (2000) 80 Cal.App.4th 1194, 1207 [court "repetitiously, disparagingly and prejudicially questioned defense witnesses"].)

In the case before us, we find that even if the judge's questioning crossed the line—and we do not think it did—it was nevertheless nonprejudicial. It is literally true that the prosecutor had not yet asked any questions about wigs or disguises, but he did indicate in his opening statement that the gunmen may have been wearing wigs and promised there would be testimony on that point: "[The police] weren't as interested in the discrepancy and in the description of the hair, because as lead investigators know, that's something that people can change. People can wear wigs, people can wear disguises, and it happens all the time. [¶] And Sergeant Medeiros will explain for you, they have caps that people can get that actually have hair sewn into it, they have dreadlocks sewn into it, have twisties sewn into it, you can get wigs, you can put caps over your heads. So they understand, yeah, hair can be disguised, that can be changed."

Thus, the question of a disguise had already been brought before the jury, and the prosecutor ultimately did back up his theory with evidence from Lieutenant Medeiros, his final witness, that criminals often wear wigs as a disguise. The testimony elicited by the court was at worst duplicative of the prosecutor's evidence and therefore nonprejudicial.

It is true, however, that the judge's questioning elicited the only evidence regarding the availability and use of gold grilles, which tended to inform the jury that Denton's identification of Johnson could have been correct even if Johnson had no gold teeth. We therefore turn our attention to the gold grilles testimony while reiterating that the objection ultimately raised was to the judge's questioning regarding "twisties or dreads, wigs," not the gold grilles.

34

Johnson points out that the judge never asked Franzen the question actually posed by the juror: whether the gold teeth were front or rear fillings. That is of minimal significance. The actual location of the assailant's gold teeth had no relevance except as it might have influenced the jury's assessment of the accuracy of Denton's identification. The judge covered that issue through his other questions.

The judge could reasonably have believed that the testimony as it stood before he asked about "false gold teeth" was incomplete and misleading in that it would have left the jury with the mistaken impression that Johnson's lack of gold teeth eliminated him as Denton's would-be kidnapper. Although the defense might have been happy with such a state of misapprehension, the judge—evidently aware of the existence of gold grilles—sought to balance out the jury's fund of knowledge by following up with the question about "false gold teeth." This was within his discretion. In light of his early comments to the jury that he might ask follow-up questions in such circumstances, the jury would not have been surprised—nor would it have perceived in such questions any usurpation of the prosecutorial role. Whether the question could have been posed more felicitously, or whether the judge should have allowed the prosecutor to ask such follow-up questions, are issues that could have been addressed had a proper objection been raised. We conclude the court's questioning of the witness did not amount to judicial misconduct. And even if it did it was nonprejudicial.

In *Harris*, the defendant, who testified at trial, claimed the trial court had "overstepped its bounds with respect to the tone, form, and number of questions posed" to him by the judge following the prosecutor's cross-examination. (*Harris*, *supra*, 37 Cal.4th at p. 350.) The Supreme Court majority did "not endorse all of the trial court's questioning" of the defendant, and in fact found some of it "inappropriate." (*Ibid*.) The dissent went further, finding the examination was "argumentative," "served only to highlight for the jury implausible aspects of defendant's testimony," and "improperly convey[ed] to the jury the judge's view that defendant's testimony was not credible." (*Id*. at pp. 371-372 (dis. opn. of Kennard, J.).) But both the majority and the dissent found any error harmless. (*Id*. at pp. 350-351, 372.)

35

The Supreme Court has applied the test of *People v. Watson* (1956) 46 Cal.2d 818, 836, as the appropriate standard of prejudice in like circumstances.[27] (*Harris*, *supra*, 37 Cal.4th at pp. 350-351.) Applying that standard, we find it unlikely the jury would have reached a verdict more favorable to Johnson in the absence of the judge's questioning of Franzen.

Significantly, no one testified that Johnson's lack of gold teeth concerned Denton or played any part in making or doubting his identification of Johnson. Johnson's appellate counsel admits "[o]ne may fairly infer that Denton was no stranger to the culture in which people wear gold grilles." That may explain why Denton failed to make a point of that discrepancy in appearance during the identification process. Johnson's counsel did not cross-examine Denton on the point that he had initially mentioned his attacker had gold teeth, probably understanding that the subject of gold grilles would come out in his answer.

As the evidence stood, Johnson's defense attorney did argue in closing that the identification of his client was shaky, in part because of the gold teeth discrepancy. He pointed out the weaknesses of the evidence identifying Johnson as one of the Antioch gunmen (e.g., that Denton was only 60 percent-70 percent sure, that Johnson did not have dreadlocks or twisties, and that Johnson did not have gold teeth ).

We are convinced that Johnson's convictions were not due to the judge's questioning about gold grilles, but to the entire corpus of evidence, which consisted of much more than simply one eyewitness identification. Denton's identification of Johnson was actually a small part of a complicated circumstantial evidence case tying Johnson to the Antioch and Oakland murders.

Cell phone records placed Johnson near the scene of the Antioch crimes at the time of their commission, and they further supported the inference that he was with

---

[27] We acknowledge the letter brief filed by counsel for Johnson dated September 15, 2011, in which he argued that the judge's questioning amounted to a trial before a biased tribunal and should be regarded as reversible per se. We reject that argument on the basis that any alleged misconduct did not constitute structural error.

Edwards at the time. (See fn. 6, *ante*.) There were also recorded jail phone calls in which Johnson and Edwards discussed eliminating witnesses, and Johnson repeatedly expressed concern about "J. Jonah" being a "wild duck" who could not be left "runnin' around" out there. It is difficult to imagine why Johnson would have been so concerned about Denton if he had not been involved in the Antioch crimes. Finally, there were the discussions of trips to "Cancun" and "Mexico." Although Johnson argues that the reference to a trip that "we" went on may actually have meant that someone other than Johnson accompanied Edwards, we find that argument unconvincing. The only reasonable interpretation of the conversation, in light of all the evidence, is that Johnson and Edwards went to "Cancun" together.

The evidence against Johnson was strong, especially when considered in light of his active role in promoting the execution of witnesses in the jail phone recordings. Taken in its totality, it was strong enough to render the judge's questioning of the witness harmless, even if it were deemed judicial error properly preserved for appeal.

### Right of allocution

As noted, Johnson filed a supplemental opening brief in which he not only reargued the issue regarding the judge's questioning of Franzen, but also raised a new issue: that he had been denied his right of allocution at sentencing. The background is as follows:

At the sentencing hearing, the court asked Johnson's trial counsel if Johnson wanted to "make a statement." Defense counsel replied, "On his behalf, Judge, if I may." Counsel stated generally that Johnson disagreed with but had "come to grips with the findings of the jury." He observed that not only Bradley's family had suffered a loss, but Johnson's family as well. The court responded that if Johnson had "heartfelt concerns" he could pass on the name of Bradley's "actual killer." Johnson's counsel suggested the court was taking his statements "out of context," and reiterated that Johnson had accepted the jury's verdict. Counsel concluded with, "And with that, I will submit the matter."

The court then invited allocution: "Okay. Does your client personally want to make any statement? I always offer the right of allocution. I don't expect it, but I

37

understand you have a common law right of allocution; he can say something. I'll take the no."

Under section 1200, a criminal defendant appearing for judgment "must be asked whether he has any legal cause to show why judgment should not be pronounced against him." This comports with the traditional legal definition of allocution under the common law. (See *People v. Evans* (2008) 44 Cal.4th 590, 593, fn. 2 (*Evans*).)

Johnson appears to use the word "allocution" to refer to a personal statement in mitigation of punishment. Under California law "a defendant [has] the right to make a personal statement in mitigation of punishment but only while under oath and subject to cross-examination by the prosecutor." (*Evans*, *supra*, 44 Cal.4th at pp. 592-593; § 1204.) The right to make a statement in mitigation may be forfeited by failure to request such a hearing. (*Evans, supra,* at p. 600.)

There is no constitutional due process right to be offered allocution. (See *Hill v. United States* (1962) 368 U.S. 424, 428 ["The failure of a trial court to ask a defendant represented by an attorney whether he has anything to say before sentence is imposed is . . . neither jurisdictional nor constitutional. It is not a fundamental defect which inherently results in a complete miscarriage of justice, nor an omission inconsistent with the rudimentary demands of fair procedure"].)

The federal circuits are in conflict as to whether a defendant has a constitutional due process right to allocution when he or she affirmatively requests to speak. (Compare *Boardman v. Estelle* (9th Cir. 1992) 957 F.2d 1523, 1530 and *Ashe v. North Carolina* (4th Cir. 1978) 586 F.2d 334, 336 with *United States v. Li* (2d Cir. 1997) 115 F.3d 125, 132-133 and *United States v. Prince* (5th Cir. 1989) 868 F.2d 1379, 1386.) Even if a constitutional right of allocution exists, the defendant must affirmatively request it. (See *United States v. Garcia-Robles* (6th Cir. 2011) 640 F.3d 159, 166, fn. 5; *DeShields v. Snyder* (D.Del. 1993) 829 F.Supp. 676, 692 ["Since the time *Hill* was decided there has been a split among the circuit courts as to whether or not the right of allocution is a constitutionally protected right. The predominant factor distinguishing the cases on either

38

side of this issue is whether the defendant has made an affirmative request to speak or not."].)

Here, neither Johnson nor his attorney told the court he wanted to make a personal statement in mitigation. Indeed, the transcript suggests that Johnson or his counsel gave some indication he did not (i.e., "I'll take the no.") His counsel spoke on his behalf, essentially saying Johnson accepted but disagreed with the verdicts; by so doing he effectively informed the court there was no legal reason why judgment should not be pronounced. And by failing to request that his client be allowed to speak at a sentencing hearing under section 1204, Johnson's counsel forfeited his right to present mitigating evidence. (*Evans*, *supra*, 44 Cal.4th at p. 600.) The court did not err under state statutory law or the federal Constitution.

But even if there had been error, it would not be reversible. Under the prejudice standard of *People v. Watson*, *supra*, 46 Cal.2d 818, 836, which applies here, Johnson has failed to show how or why it is reasonably likely the court would have exercised its sentencing discretion differently had he personally addressed it. Therefore, even assuming the court did not afford him his allocution right, Johnson suffered no actual prejudice by the presumed error.

Indeed, even if the *Chapman* standard were applied we would find no prejudice. (*Chapman v. California* (1967) 386 U.S. 18, 24.) There is no question that the crimes justified the punishment imposed in this case. The judge indicated repeatedly how seriously he viewed the crimes, calling the evidence "powerful and overwhelming" and the killing of Bradley "evil." He further said if any of the convictions were reversed on appeal he would still sentence both defendants to life without possibility of parole if it were within his discretion. Johnson has not made us aware of any persuasive arguments he might have made to encourage leniency in sentencing. A remand for resentencing would be a pointless gesture, and undeserved. Any claimed error in sentencing procedure—and we find none—would have been harmless beyond a reasonable doubt. Accordingly, Johnson's pro se claim is rejected.

## DISPOSITION

The judgments are affirmed.

_____
Richman, J.

We concur:

_____
Kline, P.J.

_____
Haerle, J.